# 16-2363-cv(L), 16-2367-cv(CON)

# United States Court of Appeals

*for the*

# Second Circuit

———————◆———————

LEVI HUEBNER, on behalf of himself
and all other similarly situated consumers,

*Plaintiff-Appellant,*

— v. —

POLTORAK PC, ELIE C. POLTORAK,

*Interested Party-Appellants,*

— v. —

MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

ANDREW M. SCHWARTZ
MARSHALL, DENNEHEY, WARNER,
 COLEMAN & GOGGIN, P.C.
2000 Market Street, Suite 2300
Philadelphia, Pennsylvania 19103
(215) 575-2600

MATTHEW B. JOHNSON
MARSHALL, DENNEHEY, WARNER,
 COLEMAN & GOGGIN, P.C.
Wall Street Plaza
88 Pine Street, 21st Floor
New York, New York 10005
(212) 376-6400

*Attorneys for Defendants-Appellees*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellees Midland Credit Management, Inc. and Midland Funding, LLC (together, "Midland") are wholly owned by Encore Capital Group, Inc., a publicly held corporation.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ...................................................................... iii

I.   COUNTER-STATEMENT OF ISSUES PRESENTED ................................... 1

II.  COUNTER-STATEMENT OF THE CASE ..................................................... 3

III. SUMMARY OF ARGUMENT ........................................................................ 20

IV. LEGAL STANDARD FOR ASSESSING CLAIMS UNDER 15 U.S.C. § 1692e. .................................................................................................... 23

V.  ARGUMENT .................................................................................................. 25

   A.   Midland did not Communicate any False Information regarding Huebner's Disputed Debt ....................................................................... 25

   B.   Midland's Questions to Huebner did not Amount to False Representations or Deceptive Means to Collect a Debt. ......................... 31

   C.   Denial of Huebner's Motion for Class Certification was Proper as the Proposed Class was Not Ascertainable and Huebner was an Inadequate Class Representative. ......................................................... 34

   D.   The Sanctions Imposed on Huebner and Poltorak Were Properly Imposed and are Supported by the Record. ......................................... 37

      1.   The district court Properly Sanctioned Poltorak for Failing to   Participate in the Initial Conference in Good Faith. ................. 37

      2.   The Sanction Imposed for Huebner's Frivolous Motion to Remove the Confidentiality Designation of Certain Documents was Justified and Proper. ........................................ 39

3.     The Decision of the District Court to Sanction Huebner and Poltorak in an Amount Equal to Midland's Fees for Moving for Sanctions is Well Grounded and Within the Court's Discretion. ........................................41

VI.  CONCLUSION ...............................................................................47

# TABLE OF AUTHORITIES

## CASES

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)........................................37

*Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993). .................................24

*D'Avanzo v. Global Credit & Collection Corp.*, No. 10 Civ. 1572, 2011 U.S. Dist. LEXIS 63823,  2011 WL 2297697 (D. Colo. April 18, 2011). ..........................36

*DeSantis v. Computer Credit, Inc.*, 269 F.3d 159 (2d Cir. 2001)...........................32

*Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) .................................38

*DiMatteo v. Sweeney, Gallo, Reich & Bolz, L.L.P.*, 619 F. App'x 7 (2d Cir. 2015) ....................................................................................................24

*Fritz v. Resurgent Capital Servs., LP*, 955 F. Supp. 2d 163 (E.D.N.Y. 2013)........24

*Gabriele v. Am. Home Mortg. Servicing, Inc.*, 503 F. App'x 89 (2d Cir. 2012).....24

*Greco v. Trauner, Cohen & Thomas, LLP*, 412 F.3d 360 (2d Cir. 2005) ..............23

*Hasbrouck v. Arrow Fin. Servs. LLC*, No. 1:09-CV-748 (MAD/RFT), 2011 U.S. Dist. LEXIS 53928, 2011 WL 1899250 (N.D.N.Y. May 19, 2011) ............. 24, 42

*Houghton v. Culver*, 467 F. App'x 63 (2d Cir. 2012) ...................................... 37, 38

*Jacobson v. Healthcare Fin. Svcs., Inc.*, 516 F.3d 85 (2d Cir. 2008).............. 24, 42

*Kahen-Kashani v. Nat'l Action Fin. Servs., Inc.,* 2004 U.S. Dist. LEXIS 28420, 2004 WL 1040384 (W.D.N.Y. 2004)...................................................................42

*Lane v. Fein, Such & Crane, LLC*, 767 F. Supp. 2d 382 (E.D.N.Y. 2011)............23

*Lautman v. 2800 Coyle St. Owners Corp.*, 14-cv-1868 (ARR)(VVP), 2014 U.S. Dist. LEXIS 137454 (E.D.N.Y. Sept. 26, 2014)......................................... 24, 31

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976)...................27

*Luxenburg v. Equifax Credit Info. Servs.,* No. 03 C 5440, 2005 U.S. Dist. LEXIS 426 (N.D. Ill. Jan. 5, 2005) ........................................................................... 27, 30

*Martin v. Kan. Counselors, Inc.*, Case No. 13-cv-02041-TJJ; 2014 U.S. Dist. LEXIS 66199 (D. Kan. May 13, 2014) ............................................................. 27

*Mazzei v. Money Store*, 829 F.3d 260 (2d Cir. 2016) ............................................. 34

*Pichardo v. C.R. Bard, Inc.,* No. 09-Cv-7653 (SHS), 2015 U.S. Dist. LEXIS 10722 (S.D.N.Y. Jan. 26, 2015) .................................................................................. 37

*Salahuddin v. Harris*, 782 F.2d 1127 (2d Cir. 1986) .............................................. 37

*Shah v. Collecto, Inc.*, 2005 U.S. Dist. LEXIS 19938 (D. Md. Sept. 12, 2005) ..... 30

*Sorenson v. Wolfson*, No. 16-1224, 2017 U.S. App. LEXIS 4591 (2d Cir. Mar. 16, 2017) ............................................................................................................... 43

*Valle v. Bendett & McHugh, P.C.*, No. 3:14-cv-1796 (SRU), 2015 U.S. Dist. LEXIS 133111 (D. Conn. Sept. 30, 2015) .................................................... 24, 29

*Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110 (2d Cir. 2009) ............... 43

## STATUTES

15 U.S.C. § 1681i(a)(2)(E). ................................................................................... 28

15 U.S.C. § 1692e. ............................................................................... 23, 24, 31, 33

15 U.S.C. § 1692e(8) ..................................................................................... *passim*

15 U.S.C. § 1692e(10) ........................................................................... 21, 31, 32

15 U.S.C. § 1692k ................................................................................................. 19

15 U.S.C. § 1692k(a)(3) ................................................................................ *passim*

28 U.S.C. § 1927 .......................................................................................... *passim*

## **R**ULES

Fed. R. Civ. P. 16(f)(1)(B)............................................................... 2, 5, 37, 39

Fed. R. Civ. P. 16(f)(1)(C)..................................................................... 15, 39

Fed. R. Civ. P. 23(a)...............................................................................34

Fed. R. Civ. P. 23(b)(3)...........................................................................34

## **S**ECONDARY **S**OURCES

Charles Alan Wright et al., 6A FEDERAL PRACTICE & PROCEDURE § 1531 (3d ed.)
.......................................................................................................38

# I.    <u>COUNTER-STATEMENT OF ISSUES PRESENTED</u>

A.   When a consumer disputes a debt that a debt collector has reported to a consumer reporting agency, does the debt collector communicate credit information which is known or should be known to be false in violation of 15 U.S.C. 1692e(8) by requesting that the consumer reporting agency delete all information the collector furnished regarding the debt?

B.   Does the Fair Debt Collection Practices Act permit a debt collector to ask follow-up questions of a consumer who wishes to dispute a debt provided that the questioning does not infringe upon the consumer's right to dispute the debt?

C.   Did the district court properly deny Huebner's motion for class certification upon finding that the proposed class was unascertainable as class members would have to be identified by a case-by-case review of records that Huebner failed to establish exist and finding that Huebner would be an inadequate representative as he was subject to the unique defense that any alleged violation he suffered was not material because it arose out of his failed attempt to entrap Midland?

D.    Was it an abuse of discretion for the district court to sanction Poltorak pursuant to Fed. R. Civ. P. 16(f)(1)(B) for failing to participate in good faith at the pretrial conference by concealing his theory of the case when Poltorak represented to the court that Midland told Huebner that his debt could only be disputed in writing and that Huebner's recording of that conversation would prove this when in fact the recording disproved the allegations and Poltorak then advanced a new theory of the case at odds with his prior claims?

E.    Was it an abuse of discretion for the district court to sanction Huebner and Poltorak for filing a frivolous motion seeking to revoke Midland's designation of certain documents as confidential in order to quote from the documents in court filings when the motion did not adhere to the process set forth in the Stipulated Protective Order for challenging confidentiality, the protective order provided a process by which a party could quote from confidential documents and Midland advised Huebner and Poltorak of the proper procedure before they filed the motion?

F.    Was it an abuse of discretion for the district court to sanction Huebner and Poltorak pursuant to 15 U.S.C. § 1692k(a)(3), 28

2

U.S.C. § 1927 and the court's inherent power for (1) asserting a claim lacking legal support, (2) prosecuting a claim in bad faith for the purpose of harassment, (3) pursuing a claim long after it was clearly not viable, (4) producing a report from a credit data aggregator instead of an actual credit report from one of the three recognized consumer reporting agencies in a possible effort to mislead the court, (5) claiming to act as a "tester" of Midland's compliance with the Fair Debt Collection Practices Act by administering a test lacking any probative value and (6) seeking to represent a class of consumers although the proposed class was unascertainable and Huebner was not an adequate class representative?

## II.    COUNTER-STATEMENT OF THE CASE

### A.    Relevant Procedural History Up to Filing of Third Amended Complaint.

Appellant Huebner ("Huebner"), with his counsel Appellant Poltorak ("Poltorak") commenced this putative class action in the United States District Court for the Eastern District of New York (the "district court") on October 15, 2014, alleging violations of the Fair Debt Collection Practices Act ("FDCPA") and

naming Midland Credit Management, Inc. ("MCM") as defendant. Joint Appendix Vol. I, pages 3; 36-48.[1]

In his original complaint, Huebner asserted, *inter alia*, that MCM had "wrongfully stated … he could not orally dispute the debt" and that Huebner "must have a reason to dispute a debt." JA I-41 at ¶¶ 21-22 & 46. The district court held an Initial Status Conference on February 2, 2015. JA I-4. The conference was conducted via telephone at Poltorak's request (JA I-87) and, therefore, no record was made of the conference. JA I -5 (Order of Feb. 17, 2015).

At the initial conference, Poltorak represented that Huebner's claim was "based exclusively on the recorded conversation" that Huebner had with MCM and that MCM "had told plaintiff that he could only dispute his debt in writing, which would violate the FDCPA." SA-53. After the Initial Conference, Poltorak produced the recorded call to the district court, which found that "the recorded conversation showed just the opposite of what counsel had represented." SA-53. The district court, *sua sponte*, issued an Order to Show Cause why the action should not be dismissed, fees and costs awarded and sanctions issued pursuant to Rule 11. SA-46.

---

[1] Like Appellants' briefs, this brief shall refer to the Joint Appendix as "JA" along with the designated volume; the Special Appendix, hereinafter "SA," and the Confidential Appendix, hereinafter "CA." Thus "JA I-46" refers to page 46 of Joint Appendix One.

Responding to the Order to Show Cause, Huebner and Poltorak presented an entirely new theory of the case in direct contradiction with the theory that Poltorak set forth at the Initial Status Conference. JA I-177-208. Specifically, Huebner alleged that his creditor Verizon improperly charged him $131.21 for rewiring outside his home; that the bill was improper because Verizon performed no work inside his home and that he disputed the bill but Verizon failed to cancel it. JA I-185-186 at ¶¶ 4-7. Huebner asserted that he spoke with an MCM agent in an effort to dispute the debt, but the agent refused to process the dispute unless Huebner provided a reason for his dispute. JA I-195-96 at ¶ 28. Further, Huebner alleged that MCM continued to report his debt to his credit history without noting his dispute. JA I-198 at ¶ 32.

The district court found that Poltorak had raised only one claim at the Initial Status Conference: that Huebner was denied the ability to verbally dispute his debt. SA-63. In support of that claim, Poltorak relied on Huebner's recording of his conversation, which actually "debunked his claim entirely." *Id.* Thereafter, Poltorak asserted new claims that were not recently discovered, were relevant and that would have materially changed the posture of the case had they been disclosed in the Joint Letter of the Parties (submitted prior to the conference pursuant to the court's individual rules) or the Initial Status Conference. *Id.* The district court concluded that Poltorak had not participated in good faith at Initial Status

5

Conference in violation of Fed. R. Civ. P. 16(f)(1)(B) and had intentionally misled the district court and Midland regarding his theory of the case. SA-63-4. For these reasons, the district court sanctioned Poltorak $500. SA-64.

Even before the district court issued the Order to Show Cause, Midland had communicated to Huebner and Poltorak that it would seek its costs and fees if they continued to pursue Huebner's baseless claims. Midland issued its first warning in the parties' Joint Letter submitted prior to the Initial Status Conference. *See* JA I-84 ("Plaintiff presses on with this action at his peril" citing 15 U.S.C. § 1692k(a)(3), under which sanctions may be imposed for bringing FDCPA actions in bad faith and for the purpose of harassment). Midland repeated these warnings frequently as the litigation progressed. *See* JA V-1116-1136 (series of communications to Huebner and Poltorak warning them to dismiss their bad faith action or face likely sanction).

Midland's warnings were intended to put both Poltorak and Huebner on notice that they ran the risk of paying its defense costs and fees. Huebner, a licensed attorney, was more involved in initiating and managing the litigation than a typical plaintiff. *See* JA V-1051 n.7 (noting Huebner's representation of other plaintiffs in an FDCPA action in which the plaintiffs implausibly denied receipt of numerous documents served on plaintiffs and delivered by certified mail). It was Huebner's decision to call Midland and record his telephone call in a failed effort

to entrap Midland that formed the basis of this action. *See* JA VI-1359. Huebner also worked closely with his counsel throughout the action. For example, Huebner does not dispute that at the deposition of Midland's corporate representative, he whispered questions for the witness in his counsel's ear at least 340 times (JA V-1086). JA VI-1284-1328.

Huebner and Poltorak amended their complaint three times, filing the Third Amended Complaint ("TAC") on June 5, 2015. JA I-7. In the TAC, Huebner alleges that Midland violated the FDCPA in its attempt to collect his $131 Verizon debt. JA II-335-53. Huebner alleged that Midland's attempt to seek an explanation from him regarding his dispute of the debt violated the FDCPA. JA II-346-49 at ¶¶ 133-52. Further, Huebner alleged that Midland failed to report his debt as disputed, also in violation of the FDCPA. JA II -350-51 at ¶¶ 164-66.

**B.** **Facts Relevant to the Third Amended Complaint.**

In 2010, Huebner switched his phone service to Verizon. JA III-632 at ¶ 6. In order to remedy problems with interference on his phone line, Verizon performed some work on the line and billed Huebner approximately $131. JA III-632 at ¶ 8. Huebner asserts that he disputed this charge and that Verizon told him they would remove it from his invoice, though Huebner did not produce any evidence that Verizon ever did so. JA III-632 at ¶¶ 9-11.

In 2013, Midland Funding ("MF") purchased Huebner's Verizon debt. JA III-632-33 at ¶¶ 13-14.[2] The records Verizon provided to MF reflected that Huebner owed Verizon $131.21. JA III-633 at ¶ 14. MCM furnished information regarding Huebner's account to the major consumer reporting agencies ("CRAs") on September 25, 2013. JA III-633 at ¶ 20. MF does not report information to the CRAs. *Id.*

MCM uses a set of codes to record account disputes. *See* CA-113. If a consumer provides a verbal dispute on an account more than 45 days after MCM's initial communication with her, MCM may code the account "050." CA-131. This code indicates that the consumer disputes the account or feels she does not owe the debt. CA-113. Midland may also code an account "289," a dispute code that causes the account to be closed, collection efforts to cease, triggers the issuance of multiple requests to delete all information furnished by MCM to the CRAs and causes a letter to the consumer to issue, advising her that MCM requested deletion of the credit information it had furnished regarding the debt. JA IV-946 at ¶ 73; *see also* JA IV-838 at 31:12-32:17 (Midland's corporate representative testifying that dispute code "289" is a "step beyond" dispute code "050;" debts coded "289" are marked disputed and closed such that collection activity is terminated).

---

[2] MF purchases debts and places them with MCM for servicing. JA III-632 at ¶ 12.

8

On August 8, 2013, MCM mailed an initial collection letter to Huebner at his home address. JA III-633 at ¶¶ 18-19. It was not returned as undeliverable. JA III-633 at ¶ 19. Though Huebner asserts that he never received the letter, he does not deny it was properly addressed. JA IV-796-797 at ¶¶ 18-19. On October 17, 2013, Huebner called MCM. JA III-634 ¶ 21. Huebner recorded the telephone conversation and eventually provided a transcript of the call to the district court. JA III-634 at ¶ 22; *see also* JA I-97-115 (transcript of call).

When MCM received Huebner's incoming call, MCM played a message stating, "This is an attempt to collect a debt. Any information obtained will be used for that purpose," then transferred him to an agent. JA III-634 ¶ 23. Huebner verified his identity to the agent and the agent stated that the amount of the debt was $131.21. JA III-634 at ¶ 24.

Huebner asked whether MCM issued a letter concerning the account; the agent responded that MCM sent a letter to Huebner at 478 Malbone Street, 1st Fl, Brooklyn, New York. JA III-634 at ¶ 25. Huebner responded, "That's wonderful to hear" and inquired how he could dispute the debt. JA III-634 at ¶ 26. The agent transferred Huebner to an MCM department that handles disputes. JA III-634 at ¶ 27.

Once connected with the dispute department, Huebner stated, "Well, I want to know what do I have to do if I want to dispute the debt." JA III-634 at ¶ 28. The

9

agent responded, "Just advise me what your dispute is and I can see if I can assist you with that." JA III-634 at 29. Huebner asked, "How do I get it off my credit report" and the agent replied, "Well, we need to, you know, work with what your dispute is in order to remove it, sir. So why are you disputing?" JA III-635 at ¶ 30.

Huebner responded, "I don't understand. I just can't get it off my credit report?" to which the agent responded, "No sir. We just can't delete an account because the consumer wants it deleted. We need to know why they want it deleted and what their dispute is. I can assist you with your dispute here, sir". JA III-635 at ¶ 31.

Huebner stated, "I don't understand. I can't get it off my credit card – my account without paying it?" JA III-635 at ¶ 32. The agent told Huebner "That's not what I said sir. I need to know what your dispute is before I can just delete it for you. So you are saying you want to dispute it. Why is it that you want to dispute it?" JA III-635 at ¶ 33. Huebner responded: "Because it is a nonexistent debt." JA III-635 at ¶ 34.

The agent stated, "Okay. Can you elaborate as to what that means? Did you already pay it with Verizon? Did you never have Verizon? JA III-635 at ¶ 35. Huebner asked, "Do you have a contact information" and then stated, "I don't understand what questions you are asking me." JA III-635 at ¶ 36.

10

The agent then stated, "Sir, you called in to dispute the debt. I need to know why you are disputing. So I'm asking you questions …" and Huebner responded, "I'm telling you it's a nonexistent debt." JA III-635 at ¶ 37. The agent stated, "Okay, sir, but I don't know what that means. It is existent because it's here in our system, so why are you stating it's nonexistent"? JA III-635 at ¶ 38. Huebner stated, "Because it is nonexistent. How am I supposed to tell you? I can't prove a negative. It is nonexistent." JA III-636 ¶ 39.

The agent stated, "I don't know what that means. So I need you to elaborate so I can assist you with your dispute. Did you ever have Verizon?" JA III-636 at ¶ 40. Huebner responded that he did not "understand what you are saying" and asked, "Do you have a contact that number?" JA III-636 at ¶ 41. The agent provided the extension number and asked, "Did you want to move forward on your dispute?" to which Huebner responded, "I told you I dispute it because it's a nonexistent debt." JA III-636 at ¶ 42.

The agent stated, "I don't understand, sir. But you haven't given me why you are disputing. You are just saying you are disputing. I need to know what you are disputing," to which Huebner responded, "It's a nonexistent debt." JA III-636 at 43. The agent asked, "[D]id you ever have Verizon service?" and Huebner stated, "You asked me, I told you. If you're telling me you are not going to take my dispute, that's fine. I'm just going to try to see if I can get more information."

11

The agent responded, "I am trying to help you with your dispute, sir, but you are not really helping me help you." JA III-636 at ¶ 44.

On October 17, 2013, the same day as Huebner's conversation with MCM, MCM processed Huebner's dispute by coding the account "289," which closed the account, ceased all collection activity and triggered a request for deletion to the CRAs. JA IV-934-35 at ¶¶ 45-46 ("Midland's Reply" portions). Further, coding the account "289" caused a letter to be sent to Huebner, informing him that the deletion requests would issue. JA IV-946 at ¶ 73 (Midland's "Response"). Though MCM's records reflect that the letter informing Huebner was properly addressed and not returned in the mail, Huebner denies receiving it. JA IV-804 at ¶¶ 50-51. In discovery, Midland produced business records proving that it had marked the debt disputed and ceased all collection efforts upon receipt of Huebner's dispute. JA IV-946 at ¶ 73 ("Response" of Midland).

MCM began the process of transmitting requests to the three major CRAs (Experian, Equifax and TransUnion) to delete the information it had reported regarding Huebner's account on October 17, 2013. JA III-636-37 ¶ 46. MCM transmitted the first deletion request to the CRAs on October 23, 2013, completing the deletion request process. JA III-637 at ¶ 47.

MCM transmitted duplicate requests for deletion of the account to the three major CRAs on November 19, 2013, December 17, 2013, and January 16, 2014.

12

JA III-637 at ¶ 48. It is MCM's practice to issue duplicate requests for deletion to the CRAs to ensure that the agencies process the request for deletion. *Id.* MCM's records reflect no later reporting activity. *Id.*

Tellingly, Huebner did not produce a credit report issued by any of the three main CRAs. JA III-637 at ¶ 52. Instead, Huebner produced redacted documents titled "CreditCheck Total." JA III-638 at ¶ 53. When asked to produce any copy of his credit report in his possession or control, Huebner produced only copies of his CreditCheck Total documents. *Id.*

The "Terms and Conditions" of Huebner's Credit Check Total report state, under "FCRA Disclosures," that "[t]he credit report you are requesting from [CreditCheck] is not intended to constitute the disclosure of Experian information required by the FCRA or similar laws. Experian's National Consumer Assistance Center provides a proprietary consumer disclosure that is different from the consumer credit report provided by [CreditCheck]. The disclosure report must be obtained directly from Experian by going to [Experian's website] or by calling [Experian's toll-free number]…. Although comprehensive, the credit reports from each of the three national credit reporting companies that are available from [CreditCheck] may not have the same information as a credit report obtained directly from the three national credit reporting companies or through the central source." JA III-638 at ¶ 54.

13

### C. Relevant Procedural and Factual History Following the Filing of the Third Amended Complaint.

On August 18, 2015, the Parties entered a Stipulated Protective Order, which was so ordered by the district court that day. CA-2-13. The Protective Order provided, *inter alia*, that if a party wished to use a portion of a protected document in a court filing, the "party shall e-file an 'Application for Leave to file Document Under Seal' … specifying precisely what the parties wish to be kept under seal and making a particularized showing of good cause as to why the court should grant the request." CA-8 -9 at ¶ 6(b). Further, the Order provided that if a party disagreed with the designation of any document as confidential, counsel shall meet and confer and, if the objection could not be resolved, the designating party shall move the court to confirm the designation. CA-5 at ¶ 3(f).

On November 4, 2015, Huebner filed a 22-page letter with the district court regarding what Huebner described as "Outstanding Discovery Issues" without first conferring with counsel for Midland as required under Local Civil Rule 37.3. CA-14-35 (Huebner's letter); JA III-573-574 (Midland's response). Huebner's publicly filed letter improperly quoted text Midland had designated confidential pursuant to the Stipulated Protective Order. *See* CA-16-17; JA III-574.

On November 5, 2015, the district court issued an Order denying Huebner's request for a pre-motion conference without prejudice to renewal via a joint

14

discovery dispute letter as required by the district court's Individual Practice Rules. SA-11. In that Order, the district court advised the parties that if they remained unable to resolve their issues, "it is highly likely that a substantial sanction will be resolved on one or both sides under Rule 37." *Id.* Further, the Court directed the Clerk to seal Huebner's letter, finding that it violated the Stipulated Protective Order. *Id.*

On November 13, 2015, rather than availing himself of the provisions in the Stipulated Protective Order for quoting from a protected document in a court filing, Huebner filed another unilateral letter request for a pre-motion conference. JA III-575-580. In this letter, Huebner asked the district court to enter an order revoking the confidential designation of several Midland documents. JA III-575. Huebner accurately stated that Midland had refused to join in a joint letter to the district court. JA III-575. Instead, Midland had advised Huebner that submission of a joint letter was not the proper method to contest a confidentiality designation. JA III-576. Further, as Huebner's letter reflects, Midland had described to Huebner the proper procedure to make such a challenge and offered to proceed with a motion to confirm Midland's confidentiality designation, as required pursuant to the Stipulate Protective Order. *Id.*

Later that day, the district court issued an Order denying Huebner's motion as frivolous and sanctioning Huebner $350 pursuant to Fed. R. Civ. P. 16(f)(1)(C)

15

for attempting to delay the action. JA I-10 (at Nov. 13, 2015). In the Order, the district court noted that Huebner had failed to follow the provisions for challenging confidential designations set forth in the Stipulated Protective Order and pointed out that Huebner was free to quote or rely upon protective documents if he following the procedures outlined in the Stipulated Protective Order. *Id.*

On November 19, 2015, Huebner filed a request for a pre-motion conference to seek reconsideration of the district court's Order of November 13, 2015. JA III-581-594. Huebner argued that sanctions were improper because the district court had not provided notice or an opportunity to be heard. JA III-586-587. Further, Huebner disputed the district court's characterization of his November 13, 2015, letter as "frivolous." JA III-591.

In response, the district court noted that the parties were on notice that sanctions would likely be imposed if they could not resolve their disputes, but Huebner chose to file his frivolous motion anyway. SA-75 at ¶ 1. Further, the district court noted that the Stipulated Protective Order specified how Huebner could challenge a "confidential" designation or quote confidential documents by applying for leave to file the document under seal. SA-75-77 at ¶¶ 2-5.

On December 1, 2015, Midland moved for summary judgment. JA IV-737. On January 27, 2016, Huebner moved for class certification. JA IV-960. The

16

district court granted Midland's motion for summary judgment and denied Huebner's motion for class certification on June 6, 2016. SA-21-40.

One week later, Midland moved for sanctions against Huebner and Poltorak, arguing that Huebner had filed this action in bad faith and for the purpose of harassment and that Poltorak had pursued a claim that had no legal basis and acted in bad faith. JA V-1077-1136. Midland asserted that it had incurred over $160,000 in fees and costs defending the action. JA IV-1535. Midland requested that the district court award this sum to Midland as a sanction against Huebner and his counsel. *Id.*

Opposing Midland's motion, Huebner asserted that he had not attempted to entrap Midland, but rather was acting as a "tester" attempting to gather evidence of Midland's wrongdoing to aid other, less sophisticated consumers than he. JA VI-1294 at ¶¶ 32-33. In fact, Huebner alleged that Midland attempted to "entrap" him to resolve his debt by asking him questions to understand the nature of his dispute. JA VI-1293 at ¶ 31.

The district court found that Huebner's efforts at testing failed, however, as the test Huebner attempted to administer had no probative value. SA-93-94. Rather than conducting himself as the "least sophisticated consumer," Huebner "deliberately ran the collection agent in circles in an effort to confuse her." SA-94.

17

The court further found that Huebner also deliberately attempted to confuse Midland's agent in connection in his effort to profit from this action, pursued his FDCPA claim long after it was clearly not a viable claim, failed to produce his credit report and was neither an adequate nor a typical class representative because of his claims efforts to entrap Midland such that he cannot establish a material violation of the FDCPA. SA-92-94; *see also* SA-38-40.

Poltorak also acted in a manner worthy of sanction. He routinely filed pre-motion conference letters that were well beyond the district court's three-page limit. *See, e.g.* JA III-554-571; 581-594. In one instance, Poltorak filed a baseless motion requesting that the district court judge recuse himself, *inter alia,* because he owned shares in an index fund that held shares of Midland's corporate parent. JA I-91-176. The district court found Poltorak's suggestion that it had a disqualifying interest in the action to be frivolous. SA-57.

Further, the district court found that Poltorak litigated claims "clearly devoid of merit" and, in the face of numerous warnings that Midland would seek its fees and costs, Poltorak failed to review Huebner's claim and evaluate whether the claims had any merit and unnecessarily multiplied the proceedings. SA-91-92.

The district court initially decided to sanction Huebner and Poltorak for Midland's fees and costs incurred in defending Huebner's motion for class certification and in moving for sanctions. SA-95-96. The district court ultimately

18

declined to award Midland its fees and costs incurred in connection with its opposition to class certification. SA-97-98.

The district court sanctioned Huebner and Poltorak in the amount of $9,850, to be paid to Midland, representing Midland's fees incurred in connection with its motion for sanctions against Huebner and Poltorak (awarding no fees in connection with Midland's motion for sanctions against Huebner's other counsel, Pomerantz, who were not sanctioned as they had stepped in at the tail end of the litigation). SA-98-101. The court calculated this sum applying the lodestar method and compensating Midland for 39.4 hours of work on the motion for sanctions at a blended rate of $250 per hour for both the partner and associate who worked on the motion.

The district court found that the number of hours worked and the hourly rate, given counsels' experience and the rates found to be reasonable in similar matters in this jurisdiction, were reasonable. SA-100. Finally, the district court found that an award of $9,850 fulfilled the purposes of § 1692k, § 1927 and the court's inherent power to sanction to punish Poltorak, deter repetition of the conduct of Huebner and Poltorak in this action and to compensate Midland for expenses incurred due to Huebner and Poltorak's obstinacy. SA-100-01.

19

### III.     SUMMARY OF ARGUMENT

#### A.     Midland Satisfied 15 U.S.C. § 1692e(8) by Requesting Deletion of all Information it Reported regarding Huebner's Account.

Upon receipt of Huebner's dispute, MCM properly marked Huebner's account "disputed" and requested deletion of all information it had reported regarding the account. These acts fully satisfied MCM's obligations under 15 U.S.C. § 1692e(8), which bars "communicating or threatening to communicate to any person credit information which is known or which should be known to be false."

Huebner focuses on the subpart of § 1692e(8), which provides that among the false information that may not be communicated is "the failure to communicate that a disputed debt is disputed" to argue that MCM's deletion request failed to communicate his dispute. This argument misses the mark, however, because to fail to communicate that a disputed debt is disputed, one must first communicate or threaten to communicate credit information which is known or which should be known to be false. MCM's deletion request contained no false information; to the contrary, the request was intended to stop the communication of credit information that Huebner had placed in dispute. Therefore, the district court's holding that MCM complied with § 1692e(8) should be affirmed.

**B.** **Midland Employed no False or Deceptive Means to Attempt to Collect Huebner's Debt.**

Huebner called MCM, claiming to dispute his debt because it was "non-existent." MCM's agent accepted the dispute but asked Huebner for further information about his dispute, as MCM's records reflected that the debt did exist. Huebner asserts that these questions violated 15 U.S.C. § 1692e(10), which bars the use of false or deceptive means to collect a debt or obtain information. This argument finds no support under the FDCPA. Simply asking questions regarding an oral dispute, so long as such questioning does not interfere with the consumer's right to dispute the debt, does not constitute the use of false or deceptive means to collect a debt.

**C.** **The District Court Properly Denied Huebner's Motion for Class Certification.**

The district court properly rejected Huebner's class certification motion as it found the proposed class to be unascertainable. Huebner sought certification of a class of consumers who verbally disputed a debt and were asked "probing questions" regarding their dispute. Identification of class members would necessarily have required an analysis of each telephone call involving an oral dispute of a debt to identify which callers were asked probing questions, a level of individual inquiry that renders the proposed class unascertainable. Further,

21

Huebner identified no evidence that recordings of the calls in question exist and could be reviewed. Therefore, denial of certification was proper on the basis of ascertainability alone.

Denial of certification was also proper because Huebner would not be an adequate class representative. The purpose of Huebner's call to MCM was to create a cause of action rather than to dispute his debt. In his attempt to create a cause of action, Huebner was evasive when questioned about the meaning of his vague dispute. Thus, Huebner's experience with MCM was qualitatively different from that of the least sophisticated consumer calling to dispute a debt, who would not have behaved in a similar fashion.

Further, as Huebner obfuscated the substance of his dispute in his effort to generate a cause of action, any resulting violation would not be material. Luring the collector into a violation of the FDCPA was the entire purpose of Huebner's call. When a consumer initiates a call with the objective of eliciting potentially incriminating statements by the collector, the caller cannot be said to be deceived or misled by the collector's statements.

### D. The Sanctions Imposed on Huebner and Poltorak Were Entirely Justified and Supported by the Evidence.

Huebner, aided by his counsel Poltorak, initiated this action by misrepresenting the contents of a call recording Huebner created for the sole purpose of generating a cause of action under the FDCPA. As the litigation

proceeded, Midland produced records in discovery showing that MCM had accepted Huebner's dispute and requested deletion of the information it reported regarding his debt. Despite receiving evidence that their claims lacked any basis in fact, Huebner and Poltorak refused to dismiss their action, instead continuing to prosecute the case in hopes of obtaining an undeserved windfall. Their frequent and frivolous motions unnecessarily multiplied the litigation, a fact that Huebner and Poltorak likely believed would redound to their benefit in the form of recoverable attorney fees under 15 U.S.C. § 1692k(a)(3).

Prosecuting a claim lacking legal support in an effort obtain an unjustified settlement is, by definition, the prosecution of a claim in bad faith and for the purpose of harassment. Huebner, an attorney admitted to the New York Bar, and created the recording giving rise to the action and actively aided Poltorak in the prosecution of the action. Under these circumstances, imposition of sanctions against both Huebner and Poltorak is justified and proper.

## IV.    LEGAL STANDARD FOR ASSESSING CLAIMS UNDER 15 U.S.C. § 1692e.

Courts in this circuit analyze whether a statement is false or misleading under § 1692e by asking whether the statement would be misleading to the "'least sophisticated consumer.'" *Lane v. Fein, Such & Crane, LLC*, 767 F. Supp. 2d 382, 388 (E.D.N.Y. 2011) (quoting *Greco v. Trauner, Cohen & Thomas, LLP*, 412 F.3d

23

360, 363 (2d Cir. 2005)). Under this standard, "collection [communications] can be deceptive if they are open to more than one reasonable interpretation, at least one of which is inaccurate." *DiMatteo v. Sweeney, Gallo, Reich & Bolz, L.L.P.*, 619 F. App'x 7, 9 (2d Cir. 2015) (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993)). Applying this standard, this Court "'bear[s] in mind the Act's 'dual purpose': in addition to protecting consumers against deceptive debt collection practices, the objective test . . . protects debt collectors from unreasonable constructions of their communications.'" *Id.* (quoting *Jacobson v. Healthcare Fin. Svcs., Inc.*, 516 F.3d 85, 90 (2d Cir. 2008)).

This Court has suggested that violations of § 1692e must be material in order to be enforceable. *Valle v. Bendett & McHugh, P.C.*, No. 3:14-cv-1796 (SRU), 2015 U.S. Dist. LEXIS 133111, at *30 (D. Conn. Sept. 30, 2015) (citing *Gabriele v. Am. Home Mortg. Servicing, Inc.*, 503 F. App'x 89, 94 (2d Cir. 2012); *Fritz v. Resurgent Capital Servs., LP*, 955 F. Supp. 2d 163, 170 (E.D.N.Y. 2013) (adopting a materiality standard); *Lautman v. 2800 Coyle St. Owners Corp.*, No. 14-cv-1868 (ARR)(VVP), 2014 U.S. Dist. LEXIS 137454, at *34 (E.D.N.Y. Sept. 26, 2014) (same)). "'Statements are material if they influence a consumer's decision to pay a debt or if they would impair the consumer's ability to challenge the debt.'" *Lautman*, 2014 U.S. Dist. LEXIS 137454, at *34 (quoting *Hasbrouck v.*

24

*Arrow Fin. Servs. LLC*, No. 1:09-CV-748 (MAD/RFT), 2011 U.S. Dist. LEXIS 53928, 2011 WL 1899250, at *4 (N.D.N.Y. May 19, 2011)).

## V.     ARGUMENT

### A.     Midland did not Communicate any False Information regarding Huebner's Disputed Debt.

The record demonstrates that MCM promptly reported Huebner's dispute by requesting deletion of the reported information, then followed the initial request with three duplicate requests for deletion. JA III-636-37 at ¶¶ 45-48. MCM first reported Huebner's account to the CRAs as "Account assigned to … collections" on September 25, 2013. JA III-624; JA IV-935 at ¶ 46 (Midland's Reply). Huebner called to dispute his account on October 17, 2013. JA III-634 ¶ 21. MCM marked the account disputed, closed the account and ceased all collection activity that same day. JA III-636 at ¶ 45; JA IV-946 ¶ 73. To do so, MCM coded the account "289," which indicated that the account was disputed and, in addition to closing the account, triggered the issuance of a deletion request to the CRAs and the issuance of a letter to Huebner, informing him that the deletion requests would issue. JA IV-946 ¶ 73.

Although Huebner argues that MCM did not accept his dispute, even he acknowledges that "MCM uses code '289' to signify that an account has been closed, collection activity ceased, and information sent to CRAs to remove the account from their records." JA IV-809 at ¶ 75. Further, as the district court found

25

and Midland's Corporate Representative testified, the "289" dispute code is simply a subset of the "050" dispute code. SA-29; JA IV-838 at 31:12-32:17 (testifying that MCM codes an account "289" when the account is to be closed and collection activity ceased as the final step of processing a dispute).

MCM's records reflect that on October 23, 2013, as well as on November 19, 2013, December 17, 2013, and January 16, 2014, MCM's reports to the CRAs regarding Huebner's debt carried the status code "DA" and status description "Delete Entire Account (for reasons other than fraud)." JA III-624; JA IV-935 at ¶ 46 (Midland's Reply). MCM cannot delete credit information it has reported to CRAs itself, rather, it requests deletion by transmitting these reports to the CRAs. *See* JA IV-944 ¶ 61 (upon receipt of dispute, MCM may request deletion of information furnished to the CRAs).

MCM's request to the CRAs to delete all information it reported concerning Huebner's account in no way violates § 1692e(8). Notably, § 1692e(8) forbids "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). In this formulation, failing to communicate that a debt is disputed is a subset of "communicating or threatening to communicate to any person credit information which is known or which should be known to be false." In other words, to fail to

26

communicate that a debt is disputed in violation of § 1692e(8), a debt collector

must be engaged in the act of communicating or threatening to communicate credit

information known or which should be known to be false.

MCM's communication to the CRAs was simple: delete all information

MCM had reported regarding Huebner's debt. JA III-636-37 at ¶¶ 45-48. In

transmitting this request, MCM did not communicate any false credit information

such that no violation of § 1692e(8) can be found. *See Martin v. Kan. Counselors,*

*Inc.*, Case No. 13-cv-02041-TJJ; 2014 U.S. Dist. LEXIS 66199, *26 (D. Kan. May

13, 2014) (collector who requested deletion did not furnish false information in

violation of § 1692e(8)); *Luxenburg v. Equifax Credit Info. Servs.,* No. 03 C 5440,

2005 U.S. Dist. LEXIS 426, at *14 (N.D. Ill. Jan. 5, 2005) (collection agency

fulfilled duty under § 1692e(8) to report dispute to CRAs by requesting that CRAs

delete reported information regarding plaintiff's account).[3]

---

[3] Huebner and Poltorak each improperly cite a consent order that Midland entered with the Consumer Financial Protection Bureau ("CFPB") as "evidence" supporting their assertion that Midland has failed to acknowledge consumer disputes. This is improper. Midland entered the Consent Order to resolve claims brought by the CFPB without admitting any findings of fact or wrongdoing. JA III-481 at ¶ 2. Further, longstanding Second Circuit case law bars the introduction of consent orders to prove the truth of the matters that led to the settlements. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). A consent order between a federal agency and a corporation "is not the result of an actual adjudication" of the issues, and therefore "it can not [sic] be used as evidence in subsequent litigation between that corporation and another party." *Id.* "[B]oth consent decrees and pleas of nolo contendere are not true adjudications of the underlying issues; a prior judgment can only be introduced in a later trial for

Provisions of the Fair Credit Reporting Act ("FCRA") support the conclusion that requesting deletion satisfies a collector's duty not to report false information under § 1692e(8). The FCRA provides three options for a data furnisher when an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified. The person furnishing the item of information may: (1) modify that item of information; (2) delete that item of information; or (3) permanently block the reporting of that item of information. 15 U.S.C. § 1681i(a)(2)(E). In this case, Midland chose to request deletion of the information at issue, thereby addressing Huebner's dispute in a manner congruent with the requirements of the FCRA and fulfilling Huebner's request that the information be removed from his credit history.

The fact that Midland satisfied its obligation under § 1692e(8) is also suggested by the truism that once a CRA deletes all information regarding a debt, there is no reported information regarding the debt left to which a dispute may attach. Attempting to lodge a dispute regarding deleted information would be akin to attempting to hang a painting on a wall that has been torn out – it cannot be done. By furnishing a request for deletion, MCM asked the CRAs to cease communicating the information that Huebner had placed in dispute. In no way

---

collateral estoppel purposes if the issues sought to be precluded were actually adjudicated in the prior trial." *Id.* at 894 (citations omitted).

could this be interpreted as reporting false information about a debt – quite the opposite – and thus Midland did not violate 1692e(8).

Assuming *arguendo* that furnishing a deletion request does not satisfy § 1692e(8) regarding the provision of notice of a dispute, such an violation would not be material because the act of requesting deletion of the information MCM reported did not impair Huebner's ability to challenge the debt. *See Valle*, 2015 U.S. Dist. LEXIS 133111, at *30-31 (no liability under § 1692e(8) where communication at issue did not impair consumer's right to dispute). As the evidence shows, MCM accepted Huebner's dispute, ceased collections and requested that CRAs delete the debt from his credit history. MCM's actions had no adverse impact on Huebner's ability to dispute his debt such that any alleged violation of § 1692e(8) is not material. Further, the lack of a dispute notation on information that has been deleted from Huebner's credit history cannot be said to have any materially adverse impact on his credit. Thus, although Midland does not concede that requesting deletion could be found to violate § 1692e(8), even if it did, no liability could plausibly attach.

Huebner attempted to bolster his § 1692e(8) claim by offering his CreditCheck document as evidence of the content of his credit report, which he asserted shows that the debt at issue was not deleted from his credit history. By its terms, however, the CreditCheck document cannot be relied upon as an actual

29

credit report from a CRA. Further, Huebner made no effort to prove his credit report was unavailable. In failing to do so, Huebner failed to offer any admissible evidence of the contents of his credit report to support his claim. *See Shah v. Collecto, Inc.*, 2005 U.S. Dist. LEXIS 19938, *6-7 (D. Md. Sept. 12, 2005) (affidavit regarding contents of credit report rejected where plaintiff could not prove the report is unavailable or involves a collateral issue).

Notably, an information furnisher such as MCM cannot "delete" an account from a CRA's records; rather, it can only request deletion of that account. Thus, the contents of Huebner's credit report are not necessarily probative of the actions MCM did or did not take with respect to furnishing deletion requests. Indeed, the proper focus of inquiry is not on the acts or omissions of the CRAs in processing MCM's requests, but on the acts of MCM and whether it properly requested deletion. *See Luxenburg*, 2005 U.S. Dist. LEXIS 426, at *11-14 (even assuming that a disputed debt remained on the plaintiff's credit report, the collector did not violate § 1692e(8) as it properly requested deletion of the information). MCM has established that it properly requested deletion of Huebner's account from his credit history and therefore fulfilled its duty under § 1692e(8).

Other than his intentional distortions of MCM's records, Huebner points to no probative evidence that MCM failed to request deletion. Huebner speculated that his account remains open, although Midland's corporate representative

testified, and MCM's records show, that his account is closed. Huebner speculated that his inadmissible CreditCheck documents show that MCM did not delete the account from his credit history, though MCM's records show that it repeatedly requested deletion. Such "evidence" is insufficient to create a genuine issue of disputed fact.

Finally, contrary to Huebner's unsupported suggestions, disputing a debt does not exonerate one from liability for that debt. Rather, it simply obligates a debt collector to recognize the dispute. *See* 15 U.S.C. §§ 1692e and 1692g (collector's duties upon receipt of dispute do not include zeroing out the balance). Thus, Midland was under no obligation to report that the debt no longer existed. Therefore, as the district court properly concluded, Midland satisfied all obligations under § 1692e(8) and dismissal of that claim was proper.

### B. Midland's Questions to Huebner did not Amount to False Representations or Deceptive Means to Collect a Debt.

As the district court found, Midland did not violate 15 U.S.C. § 1692e(10) by simply asking questions of Huebner when he disputed his debt. Section 1692e(10) prohibits using "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." As noted *supra*, only a material statement may violate § 1692e, and "[s]tatements are material if they influence a consumer's decision to pay a debt or if they would impair the consumer's ability to challenge the debt." *Lautman*, 2014 U.S. Dist.

31

LEXIS 137454, at *34. As MCM's questions to Huebner regarding his vague dispute in no way impaired his ability to challenge the debt, Huebner fails to state a claim under § 1692e(10).

The evidence is clear that although MCM asked Huebner for details regarding his vague dispute, it nonetheless accepted the dispute by coding the account "289," closing the account and requested deletion of its reported information. JA IV-946 at ¶ 73 (Midland's response). The fact that MCM accepted Huebner's dispute, despite his refusal to explain what he meant by characterizing the debt as "nonexistent," belies his claim that MCM requires a consumer to explain the basis of her dispute before it will accept the dispute.

Nor did Midland require a "valid reason" to dispute the debt. Midland accepted Huebner's dispute even though it was virtually nonsensical. Therefore, Huebner's reliance on *DeSantis*, which held that a collection letter that "insists on a valid reason for failure to make payment" had the capacity to confuse an unsophisticated consumer, is misplaced. *See DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 162 (2d Cir. 2001). Nothing in the record suggests that that Midland honors only "valid" disputes or that the consumer must provide a "valid reason" to dispute a debt.

Further, there is nothing inherently false or deceptive about the questions MCM's agent asked Huebner regarding his dispute. When Huebner stated, "I'm

telling you it's a nonexistent debt," MCM's agent replied, "Okay, sir, but I don't know what that means. It is existent because it's here in our system, so why are you stating it's nonexistent?" JA II-371 at 8-12. In response to the question "[d]id you ever have Verizon, sir?" Huebner stated, "I don't understand the question you are asking me. This is a nonexistent debt. I don't understand the question you are asking me." JA II-373 at 15-21. Although Huebner's responses are confusing, Midland's questions are clear. In fact, the agent acknowledged Huebner's dispute several times. *E.g.* JA II-369 at 15-16 ("So why are you disputing"); JA II-372 at 24-25 ("Did you want to move forward on your dispute?"); JA II-374 at 7-9 ("I am trying to help you with your dispute, sir, but you are not really helping me help you").

In no way did Midland impair Huebner's right to dispute. Therefore, MCM's questions to Huebner regarding the basis of his dispute cannot be material statements in violation of § 1692e. As the district court rightly concluded, "[t]he fact that [Midland's] representative wanted a smidgen of detail about the dispute, when [Huebner] was being obviously and intentionally vague, does not amount to a statutory violation." SA-45-46.

**C.    Denial of Huebner's Motion for Class Certification was Proper as the Proposed Class was Not Ascertainable and Huebner was an Inadequate Class Representative.**

A district court order denying class certification is reviewed for abuse of discretion. *Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016) (citation omitted). This standard applies to the ultimate decision on class certification as well as to rulings on each of the Rule 23 requirements. *Id.* A decision granting certification is given greater deference than a decision denying certification. *Id.* (citations omitted).

Huebner had the burden to establish numerosity, commonality, typicality, adequacy of representation, predominance of common questions of law or fact, and the superiority of a class action to other procedures. *See id.* (citing Fed. R. Civ. P. 23(a), (b)(3)). The district court properly denied Huebner's motion for class certification because Huebner failed to establish ascertainability and adequacy of representation. *See* SA-35-40.

Huebner proposed a nationwide or New York-only class defined to include "All persons who, according to [Midland's] records (a) have a United States [or, alternatively, New York] mailing address; (b) within one year before the filing of this action; (c) verbally disputed the debt; and(d) were asked probing questions regarding the reason for the dispute." JA IV-960-61.

34

Examining ascertainability, the district court noted that Huebner had proposed identifying potential class members who disputed debts by determining which debts had been marked verbally disputed by Midland. JA IV-977; SA-35. Huebner posited that all those consumers who had verbally disputed their debts were required to provide a valid reason to do so, that those consumers were all "treated exactly the same way" and that Midland used "probing questions" to identify the reasons for their disputes. JA IV-979.

The court found that there was no evidence supporting Huebner's supposition that Midland maintained any recordings of the conversations at issue (SA-37), and indeed Huebner's motion for class certification did not represent that Midland had. JA IV-973-974 at § IV. Further, the court found that evaluating which consumers were asked "probing questions" would require an assessment of both what constitutes "probing" questioning as well as a case-by-case evaluation to determine which questions had an improper deterrent effect to a consumer seeking to dispute her debt and which did not. SA-36. Finding that there was no feasible way to distinguish between reasonable, legitimate questions and those that would have an undue deterrent effect, and further that Huebner offered none, the court found the proposed class was "utterly unascertainable." SA-38.

Next, the court found that Huebner was an inadequate class representative as he was subject to unique defenses not afflicting the other class members – namely,

35

that "his FDCPA claims should be rejected because by attempting to entrap the collection agent into violating the statute he will be unable to allege a material violation of the FDCPA." SA-39. The allegedly violative statements of Midland may not be material and would not support liability "'if the consumer initiated the telephone call at the direction of his … counsel and with the objective to elicit and tape-record potentially incriminating statements by the debt collector.'" SA-39 (quoting *D'Avanzo v. Global Credit & Collection Corp.*, No. 10 Civ. 1572, 2011 U.S. Dist. LEXIS 63823, at *12, 2011 WL 2297697, at *4 (D. Colo. April 18, 2011)). At trial, Midland could point out to the jury that instead of just stating why he disputed the debt, Huebner "engaged in a game of cat-and-mouse." SA-40. Thus, Huebner's experience would be qualitatively different from the other members of the putative class. *Id*. Further, as Huebner's behavior would undermine his claim, he could cause the members of the putative class to suffer an adverse verdict. *Id.* Therefore, the district court properly concluded, Huebner would not be an adequate class representative.

The evidence clearly supports the district court's findings regarding ascertainability and adequacy of representation. In fact, the frivolous nature of Huebner's motion for class certification later formed one of the bases upon which the district court was going to sanction Huebner and Poltorak (SA-95) until the court reconsidered that portion of the sanctions for reasons unrelated to the

36

propriety of the certification motion. SA-98. In light of the evidentiary support for the district court's denial of class certification, the decision was clearly within the sound discretion of the court and should be upheld.

**D.      The Sanctions Imposed on Huebner and Poltorak Were Properly Imposed and are Supported by the Record.**

As set forth *supra* in Section II, a proper factual basis exists for each of the sanctions the district court imposed upon Poltorak and Huebner.

**1.      The district court Properly Sanctioned Poltorak for Failing to Participate in the Initial Conference in Good Faith.**

Federal Rule of Civil Procedure 16(f) governs the imposition of sanctions for the failure to participate in good faith in pretrial conferences. *Houghton v. Culver*, 467 F. App'x 63, 64 (2d Cir. 2012) (citing Fed. R. Civ. P. 16(f)(1)(B)). Rule 16(f) authorizes a judge to impose sanctions on a party who "fails to obey a scheduling or pretrial order." *Salahuddin v. Harris*, 782 F.2d 1127, 1133 (2d Cir. 1986). In addition, a federal court has inherent powers to "discipline attorneys who appear before it," including "the powers to policy the conduct of attorneys as officers of the court and to impose sanctions for attorney misconduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

"A finding of bad faith is not a prerequisite to an award of sanctions pursuant to Rule 16(f)." *Pichardo v. C.R. Bard, Inc.,* No. 09-Cv-7653 (SHS), 2015

U.S. Dist. LEXIS 10722, at *7 (S.D.N.Y. Jan. 26, 2015) (citing Charles Alan Wright et al., 6A FEDERAL PRACTICE & PROCEDURE § 1531 (3d ed.) (footnote omitted); *cf. Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) ("Since Rule 37(c)(1) by its terms does not require a showing of bad faith, we now hold that such a requirement should not be read into the Rule.").The Court reviews a district court's imposition of sanctions under Rule 16(f) for abuse of discretion. *Houghton*, 467 F. App'x at 64.

At the initial case conference, Poltorak represented that Huebner's claims were based entirely on the recorded conversation and that MCM told Huebner that he "could only dispute his debt in writing." SA-53. In fact, the district court found that Poltorak's statements were entirely untrue, and that after Huebner verbally disputed his debt, Midland instructed the three major CRAs to delete Huebner's account. SA-53-54.

In responding to the district court's Order to Show Cause, Poltorak proposed an entirely new theory of the case that was at odds with that he previously espoused. SA-62; *see also* JA II-241-246 (setting forth Huebner's new claims). Poltorak did not contend that his new claims were recently discovered, nor could he, as they were based on a call recording in Huebner's possession since he made the call giving rise to the action. As the district court properly concluded, Poltorak's statements at the Initial Status Conference constituted a knowing

38

attempt to mislead that court, as well as Midland, as to his theory of the case. SA-63-64.

Good faith required that Poltorak disclose his theory of the case at the Initial Status Conference to permit the parties and the court to structure discovery by identifying material issues. The district court's finding that such conduct "is not the good faith cooperation required by Rule 16" and thus was deserving of sanction under Rule 16(f)(1)(B) is supported by the evidence and therefore should be upheld.

### 2. The Sanction Imposed for Huebner's Frivolous Motion to Remove the Confidentiality Designation of Certain Documents was Justified and Proper.

Pursuant to Rule 16(f)(1)(C), the district court sanctioned Huebner $350 for attempting to delay the action by filing a frivolous motion seeking to revoke certain "confidential" designations applied to Midland's documents. SA-11 at Nov. 13, 2015. Rule 16(f)(1)(C) permits a court, on motion or on its own, to issue sanctions if a party or its attorney "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C).

As described *supra* in Section II, on August 18, 2015, the parties entered a Stipulated Protective Order. *See* CA-2-13. The Order provided that a party who wishes to use a portion of a protected document in a court filing shall file an "Application for Leave to file Document Under Seal." CA-8 -9 at ¶ 6(b). Further,

the Order also provided that if the parties disagreed with the designation of a document as confidential, the designating party shall move the court for confirmation of the designation. CA-4 at ¶ 3(f).

On November 4, 2015, Huebner filed an improper unilateral request for a pre-motion conference to resolve an alleged discovery dispute. SA-14-35. In this request, Huebner and Poltorak included Midland's confidential information but took no steps to protect that information. *See, e.g.* SA-16-17. In response, Midland filed a motion to strike Huebner's motion or to seal or redact the confidential information. JA III-573-74. In an Order denying Huebner's request, the court found that Huebner's motion violated the protective order, ordered Huebner's motion sealed and warned the parties that, if they were unable to resolve their disputes, "it is highly likely that a substantial sanction will be resolved on one or both sides." JA I-10 at Nov. 5, 2015.

Thereafter, instead of following the procedures outlined in the Stipulated Protective Order for challenging the designation of confidentiality of a document, and despite the fact that Midland's counsel alerted Huebner and Poltorak to those provisions, Huebner filed a unilateral letter request for a pre-motion conference to request that the court order the revocation of certain confidential designations of Midland's documents. JA III-575-580.

40

Given that the proper method of challenging a confidential designation is set forth in the Protective Order to which Huebner and Poltorak stipulated, Huebner's letter motion was clearly frivolous and worthy of the sanctions imposed by the court, as *de minimus* as they were. Despite this, Huebner moved for reconsideration. JA III-581-594.

Responding to Huebner's request for reconsideration, the district court reminded Huebner and Poltorak that it had warned that sanctions were likely if the parties could not resolve their disputes. SA-75. Despite being placed on notice of this risk, Huebner filed his motion even though the proper procedure to challenge such a designation was set forth in the Stipulated Protective Order. *Id.* The district court affirmed its finding that Huebner's motion was frivolous. SA-76-77. As the record shows that the district court's decision to impose sanctions in this instance was clearly within the court's sound discretion, this decision should be upheld as well.

> 3. **The Decision of the District Court to Sanction Huebner and Poltorak in an Amount Equal to Midland's Fees for Moving for Sanctions is Well Grounded and Within the Court's Discretion.**

On November 10, 2016, the district court issued an Order granting Midland's request for sanctions against Huebner and Poltorak pursuant to 15 U.S.C. 1692k(a)(3), 28 U.S.C. § 1927 and the court's inherent power. SA-84. As

set forth below, the court properly applied the standards governing sanctions under each provision and its decision to sanction both Huebner and Poltorak should be upheld.

The FDCPA provides that "[o]n a finding by the court that an action under this section was brought in bad faith and for the purposes of harassment, the court may award to the defendant attorneys' fees reasonable in relation to the work expended and costs." 15 U.S.C. § 1692k(a)(3). To obtain an award under this section, a defendant "must provide evidence of plaintiff's bad faith (as opposed to counsel's bad faith) and proof that the suit was instituted for the purpose of harassment." *Hasbrouck v. Arrow Fin. Servs. LLC*, No. 1:09-CV-748, 2011 U.S. Dist. LEXIS 53928, at *20 (N.D.N.Y. May 19, 2011) (citing *Kahen-Kashani v. Nat'l Action Fin. Servs., Inc.*, 2004 U.S. Dist. LEXIS 28420, 2004 WL 1040384, at *7 (W.D.N.Y. 2004)). The decision of whether to award attorneys' fees to a defendant under § 1692k(a)(3) is left to the discretion of the district court. *See Jacobson v. Healthcare Fin. Servs, Inc.*, 516 F.3d 85, 96 (2d Cir. 2008) ("[W]e review for abuse of discretion a district court's decision to award attorneys' fees to a defendant pursuant to the FDCPA.").

Under 28 U.S.C. § 1927, a district court may impose sanctions on an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. "An award of sanctions under this provision

42

requires a showing that an attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Sorenson v. Wolfson*, No. 16-1224, 2017 U.S. App. LEXIS 4591, at *6 (2d Cir. Mar. 16, 2017) (internal quotation marks and citation omitted). Further, this Court has held that "such sanctions may only be imposed when there is a finding of conduct constituting or akin to bad faith." *Id.* (internal quotation marks and citation omitted). This Court reviews decisions regarding sanctions under § 1927 for abuse of discretion. *Id.* (citation omitted).

Finally, imposition of sanctions under a court's inherent powers requires a finding that an attorney acted in bad faith. *Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) (citation omitted). Inherent power sanctions may be imposed "only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Id*. (citation omitted). Conduct is "entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Id.* (citation omitted). A finding of bad faith or a finding that conduct is without color or for an improper purpose must be supported by a high degree of specificity in the factual findings. *Id.*(citation omitted).

As outlined *supra* in Section II, the conduct of Poltorak in filing and maintaining this litigation was appropriately sanctionable. Poltorak first advanced a theory of the case that proved to be false; then advanced a new theory of the case, although the new theory did not arise out of the discovery of any new evidence. Poltorak's new theory, that Midland violated the FDCPA because it asked Huebner questions regarding his dispute, finds no support in the FDCPA. In fact, the district court found this allegation to be "absurd." SA-91.

Further, as the district court found, once Midland produced documents reflecting that it had marked Huebner's debt disputed, requested its deletion, ceased all efforts to collect his debt and sent Huebner a letter advising him of these actions, "Poltorak's failure to recognize that the case was devoid of merit was simply beyond the pale." SA-91.

Poltorak filed a baseless motion for recusal, repeatedly filed pre-motion conference letters that ran well beyond the court's three-page limit and failed in his continuing obligation to review and evaluate Huebner's claim to assess whether it had any merit. SA-91-92. In addition, Midland explicitly warned Poltorak and Huebner that it would seek its fees and costs should Poltorak continue to litigate the action repeatedly over the course of this action. SA-92.

This conduct, considered *in toto*, clearly reflects Poltorak's multiplication of the proceedings in an unreasonable and vexatious manner, as the claims he

advocated were so completely devoid of merit as to make it clear that they were undertaken for an improper purpose – to harass Midland into paying an exorbitant amount to settle his baseless claims. SA-92.

Huebner himself also shoulders blame for filing and maintaining this action. The district court sanctioned Huebner pursuant to § 1692k(a)(3) and the court's inherent power to sanction for the same reasons it sanctioned Poltorak. SA-92. He initially asserted a claim that his own call recording established was not true; then he alleged that the debt at issue was invalid and claimed that he did not receive either letter MCM mailed him though they were mailed to him at the address he verified was his and were not returned in the mail. SA-93; JA III-633 ¶¶ 18-19; JA IV-804 at ¶¶ 50-51.

Huebner attempted to assert claims arising out of allegedly incomplete data appearing on his consumer credit history. SA-93. Oddly, however, Huebner never offered into evidence a copy of his actual credit report despite the fact that his credit history was freely available to him had he simply requested it. *Id.* The district court believed that Huebner's failure to produce a copy of his credit report suggested an effort to mislead it. *Id.*

The district court noted that although Huebner denied his intent was to entrap Midland but rather to act as a "tester" to ascertain Midland's compliance with the FDCPA, the test Huebner attempted to administer had no probative value.

45

SA-93-94. Rather than conducting himself as the "least sophisticated consumer" would, Huebner "deliberately ran the collection agent in circles in an effort to confuse her." SA-94. As such, this test had no probative value in gauging Midland's compliance with the FDCPA. *Id.* The district court found Huebner's conduct constituted barratry. *Id.*

The inevitable conclusion is that Huebner continued to press this action long after it was clear that he failed to state a claim in an effort to harass Midland into settling his claim. In fact, the district court found that each claim Huebner asserted was either factually or legally wrong. SA-93.

Although Midland sought over $160,000 in sanctions, representing its calculation of its costs and fees in defending the action (JA IV-1535), the district court awarded only a modest sum, finding that an award of Midland's fees incurred in connection with its motion for sanctions alone to be sufficient. SA-98. The district court found that a larger award encompassing Midland's fees in connection with the entire action (SA-95-96), or even in connection with its opposition to Huebner and Poltorak's baseless class certification motion was unwarranted. SA-98. The district court also declined to award any fees related to Midland's expenses pursuing sanctions against Huebner's former counsel Pomerantz as the court declined to impose sanctions against Pomerantz. SA-99.

46

In the end, employing the lodestar method for determining attorneys' fees, the district court awarded Midland $9,850 for 39.4 hours of work on the sanctions motion (subtracting the time for work related to the Pomerantz firm) at a blended rate of $250 per hour for the work of a partner and an associate. SA-99-100. The court found that Midland's billing was sufficiently detailed, the hour rates reasonable in light of counsels' experience and the hourly rates appropriate in comparison to similar cases in the Eastern District of New York. SA-100. Further, the district court found that the award accomplished the purposes of § 1692k(a)(3), § 1927 and the court's inherent power to sanction because it "adequately: (1) punishes Poltorak; (2) deters repetition of sanctionable conduct by [Huebner] and Poltorak; and (3) compensates [Midland] for expenses caused by its opponent's obstinacy." SA-100-101.

## VI.     CONCLUSION

Huebner and Poltorak's initial claims against Midland were quickly proven false after a review of their own call recording. Rather than admitting that they had no claim upon which relief could be granted, they conjured new claims that they should have realized were baseless upon Midland's production of evidence disproving the allegations. Despite this, Huebner and Poltorak pursued this action, filing numerous frivolous motions, multiplying the action and needlessly squandering judicial resources as well as those of Midland. Having not realized

47

when to admit defeat, Huebner and Poltorak now bring this frivolous appeal. For all the foregoing reasons, the judgment of the district court should be affirmed.

Dated: New York, New York      Respectfully submitted,
       June 30, 2017

                        **MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, P.C.**

              By:    */s/ Andrew M. Schwartz*
                      Andrew Schwartz
                      2000 Market Street, Suite 2300
                      Philadelphia, PA 19103
                      Ph: 215.575.2765
                      AMSchwartz@mdwcg.com

                      */s/ Matthew Johnson*
                      Matthew B. Johnson
                      Wall Street Plaza
                      88 Pine Street, 21st Floor
                      New York, New York 10005
                      Ph: 212.376.6433
                      MBJohnson@mdwcg.com

                      *Attorneys for Defendants*
                      *Midland Credit Management, Inc.*
                      *and Midland Funding, LLC*

**CERTIFICATE OF COMPLIANCE**
**Fed. R. App. P. 32(a)(7)(B)**

The undersigned hereby certifies that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because the brief contains 10,994 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word® 2007 in Times New Roman font size 14.

Dated:  June 30, 2017

*/s/ Matthew Johnson*
Matthew B. Johnson